74 N.J. Super. 316 (1962)
181 A.2d 366
HARRY HANDLEMAN, PLAINTIFF-APPELLANT,
v.
FRANK COX, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 26, 1962.
Decided May 18, 1962.
*318 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Myron W. Kronisch argued the cause for appellant (Messrs. Roskein, Kronisch, Felzenberg & Mandell, attorneys).
Mr. Samuel A. Larner argued the cause for respondents (Messrs. Budd, Larner & Kent, attorneys).
*319 The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff Harry Handleman appeals from a judgment of the Superior Court, Law Division, dismissing his personal injury action at the close of his case against defendants Frank H. Cox and Jack A. Tillotsen, individually and t/a J & J White Diamond Co. The accident occurred on June 6, 1958, when plaintiff fell down a flight of stairs leading from the kitchen to the basement of defendants' premises.
Handleman has been employed by the Senak Corporation since May 1957 as a salesman and bill collector. Senak is a retail dealer of household goods, including silverware, electrical appliances, watches, blankets, sheets, pillow cases, dishes and lamps. Senak's representatives negotiate sales with members of the public on an individual basis and then periodically return to collect the installment payments from the buyers.
Cox and Tillotsen concede that they own and operate the J & J White Diamond Diner in Plainfield, N.J. The premises consist of a one-story diner-hamburger stand containing a dining area, kitchen and basement. The dining area and counter are in the front of the building, with the kitchen in the rear. The public enters the diner through a door that fronts on a street; a parking area surrounds the rest of the building. The only other entrance to the building is through a door in the rear of the premises.
In April 1958, approximately two months before the accident, Lloyd W. Bateman, an employee of defendants, purchased some merchandise from a Mr. Goldberg, another Senak salesman. This sale took place at the counter, as did Bateman's installment payments of $1 per week.
In May 1958 Harold L. Cox, defendant Cox's nephew and a counterman at the diner, purchased a set of silverware from a Senak salesman, but not from Handleman. He purchased the merchandise and made his weekly payments at the counter.
*320 Handleman testified that in the course of his employment with Senak he went to the White Diamond for the first time on June 6 at about 11:30 A.M. to make collections. He explained that:
"* * * every once in a while we had new cards come into our routes which salesmen made on the outside. They come in your territory, and automatically you get those cards in your route. Whatever day it is, you get those new cards in there. At that time I had three new cards for the White Diamond."
He entered the diner through the front door and saw two of defendant's employees, Lawson and Savage, working behind the counter. Lawson was at the hamburger stand, and Savage was making coffee. There were a number of customers in the diner; "the place was full * * * all the stools were taken." Handleman introduced himself to Lawson, who inquired if he had any silverware for sale. As the result of this conversation Handleman went to his car for two boxes of silverware. Plaintiff was told by Lawson to bring the silverware into the kitchen area through the rear door.
Handleman left through the front door and removed the silverware from his car, which was apparently parked behind the diner. Each box measured about 18 inches long, 12 inches wide and 5 inches deep. He held these boxes in front of him as he approached the open rear door.
The rear doorway of the diner is located approximately in the center of the rear of the building. The door swings away from the building towards the left. Directly inside the door is a slightly raised platform, about 38 inches wide by 29 1/2 inches long. At the far end of this platform, directly opposite the doorway, is the stairway opening measuring several square feet. From that end of the platform the stairway extends down to the basement.
From the photographs received in evidence we observe that, as one looks into the building through the rear door, the opening leading to the basement is bounded, on the left, *321 by a wall that extends from the rear door into the kitchen and, on the right, by the kitchen floor. That floor is raised several inches above the level of the platform. The platform, as noted, forms the third or near side of the opening, while an extension of the kitchen floor forms its fourth or far side. A wooden railing about four feet high surrounds this opening on the two sides formed by the kitchen floor. The opening, however, is in no way enclosed at the top of the stairway. To enter the kitchen area from the outside, then, one must step up onto the platform, turn to the right and step up to a higher level onto the kitchen floor.
Handleman approached the open door at an angle, his left side nearest the building. As he drew near the door he observed Lawson standing by the railing. He also noticed a coffee container carton, 2 feet high and 18 to 24 inches wide, standing on the platform. He testified that, "All I seen was the box and the rail. Anything else I did not see. * * * At that time I didn't know it [the carton] was in front of the stairs, but it was right in front of the stairs and you could not see nothing." While plaintiff conceded that the carton did not cover the entire width of the passageway into the basement, nevertheless, "you could not see anything * * *." Handleman then stepped up on the platform and
"went to my right, where Mr. Lawson was standing there. There is a little rail there. He told me to put the two sets of silverware down, which I did. Doing that, I just made one move, and down the stairs I went. Mr. Lawson grabbed the boxes."
Plaintiff fell to the bottom of the stairs, injuring his shoulder, elbow, hip and side. He remained in the basement resting for 10 or 15 minutes before he "crawled" upstairs, left the boxes of silverware with Lawson and Savage, and had them sign a receipt for the merchandise. Plaintiff left the diner and went directly home.
*322 Savage testified that he had never purchased any Senak merchandise prior to June 6, although he and Lawson had previously discussed such purchases. He corroborated Handleman's testimony of the time of his arrival, the number of customers at the diner and that all the stools at the counter were occupied. He had no discussion with plaintiff while he was in front of the diner but he observed that after Handleman had spoken to Lawson, the salesman left by the front door. Savage was by the grill and from that position saw plaintiff enter the rear door. He also observed the coffee container carton on the platform. At the precise moment that Handleman fell into the cellar, however, Savage was waiting on customers and did not witness his fall. Savage testified that neither of the defendants was in the diner at the time these events took place. He also stated that "the supply man" had placed the carton on the platform 10 or 15 minutes before Handleman came to the rear door.
Lawson did not testify at the trial. Savage stated that the last time he heard of Lawson was "a year or a year and a half" before the trial.
Richard M. Newman, a licensed architect, testified that the construction of the stairway and platform violated the local building ordinance and the National Building Code, both of which were received into evidence, in two respects: (1) the stairs should have been enclosed at the basement and first floor landing for the safety of those using the stairs and for fire protection; and (2) the depth of the platform (29 1/2") did not meet the minimum required under the circumstances.
Defendants admitted the following in the demands for admission served on them by plaintiff: (1) "that deliveries of food supplies and merchandise were made through the rear door at the time of the accident, and for some time prior thereto"; (2) "that deliveries of merchandise were regularly made to the rear entrance of defendant's premises by suppliers * * *"; and (3) "that sales of silverware *323 were made by plaintiff to Clay Lawson and Marvin Savage in the rear of the store, after the fall down the cellar stairs."
Portions of defendant Cox's deposition were read into evidence. He admitted knowing that Senak salesmen came to his diner to sell silverware but was not sure if he had himself purchased any Senak merchandise. He stated that if he had made any purchases they were completed in the front of the diner "because I don't allow nobody in the back."
Defendant Tillotsen stated in his deposition that he "never purchased anything" at the diner for his home or personal use. He knew that Bateman and other employees had made such purchases:
"Because they used to take money and pay for this, what they bought, and put down on the books, when this man came around to collect for whatever they bought. You know, this take-out money, if they didn't have the money they would put it down on a take-out slip."
Tillotsen stated that he first knew plaintiff had fallen when he came to the diner in the afternoon of June 6 and "Lawson told me that a man fell down the stairs."
At the conclusion of plaintiff's case, defendants moved for dismissal of the action. They claimed a dismissal was warranted whether Handleman be considered a trespasser or a licensee. Parenthetically, we observe that defendants, under the terms of the pretrial order, contended that plaintiff's status "at the time of the accident was that of a mere licensee."
At the conclusion of the argument the trial judge stated:
"* * * I cannot see how I can send this case to the jury. * * * I would say from the facts in this case it might be inferred that there was either an implied invitation or a license (probably implied invitation) that permitted the employees of the owner to have salesmen call upon them in the diner, but I cannot see how I could allow a jury to decide that there was anything but a trespass *324 insofar as the rear of the premises were concerned, and that being so, I cannot find any willful injury, hidden trap, and I would be unwilling to submit it to the jury on that basis.
I agree with the thesis of Mr. Kent that there would have to be an implied invitation to the rear of the premises, and there is no fair inference of that.
I will grant the motion." (Emphasis added)
Plaintiff then moved to reopen his case and made an offer of proof of an investigator's report made by A.J. Anderson. The report stated:
"Mr. Cox [the defendant] has himself purchased merchandise from these Senak salesmen * * * and he knows that his employees have made similar purchases. These salesmen would usually come in the front entrance but if the place was busy they would be asked to come around to the back entrance which leads into the kitchen. This back entrance is not a public entrance * * * but exceptions were made for these salesmen."
Anderson was in the court room prepared to testify to the contents of his report. Plaintiff's attorney generally indicated he had intended to question defendant Cox, when he took the stand, as to whether he had made these admissions to Anderson. Had Cox denied the statements, he then intended to call Anderson as a rebuttal witness. The judge, by way of a rhetorical question, asked "[H]ad he [plaintiff] put in this testimony, he would be home free, wouldn't he?" He added that he believed that plaintiff's attorney
"* * * always recognized his problem of invitation to come into the back door, and he hoped he had enough without this. When he finds he does not have enough, he now says, `I want a second bite at the apple.'"
The judge then permitted "the offer of proof to stand on the record," and ruled that "in the exercise of my discretion, I cannot in good conscience permit a reopening," and dismissed the jury.
*325 On this appeal plaintiff urges two grounds for reversal: (1) the granting of defendants' motion to dismiss the complaint at the close of plaintiff's case; and (2) the denial of plaintiff's motion to reopen.
It is fundamental that on a motion for involuntary dismissal the court may not weigh the evidence but must accept as true all the evidence which supports the party against whom the motion is made, and give him the benefit of all legitimate inferences which may be drawn therefrom in his favor. Long v. Landy, 35 N.J. 44, 53-4 (1961); O'Donnell v. Asplundh Tree Expert Co., 13 N.J. 319, 328 (1953); Hardman v. Ford Motor Co., 70 N.J. Super. 275, 290 (App. Div. 1961), certif. denied 36 N.J. 299 (1962).
As already noted, the trial judge ruled, as a matter of law, that Handleman was a trespasser at the rear of the diner, and that defendants had breached no duty owed to him as a trespasser. Plaintiff claims there was sufficient evidence before the jury from which it could have found that he was an invitee when he entered the rear room. In reviewing the granting of the motion for dismissal, therefore, we must first consider Handleman's status in relation to defendants at the time he was injured.
Plaintiff, in order to recover, had the burden of proving a breach of duty owed to him. The particular duty owed depended upon whether his status was that of an invitee, licensee, or trespasser. The basic rules pertaining to the distinctions between trespassers, licensees and invitees are settled. Lordi v. Spiotta, 133 N.J.L. 581, 584 (Sup. Ct. 1946). A trespasser is one "who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement, Torts (1934), § 329, p. 891; Prosser, Torts (2d ed. 1955), § 13, p. 54; 1 Harper & James, Torts (1956), § 1.4, pp. 11-12. Our authorities describe the trespasser as one who is "neither invited, suffered, nor privileged" to be on another's property. State v. Wouters, *326 71 N.J. Super. 479, 486 (App. Div. 1962); Williams v. Morristown Memorial Hospital, 59 N.J. Super. 384, 389 (App. Div. 1960). A licensee is a person "who is privileged to enter or remain upon land by virtue of the possessor's consent." Restatement, Torts, supra, § 330, p. 893; Prosser, supra, § 77, p. 445; 2 Harper & James, supra, § 27.1, p. 1431. The licensee is not invited but his presence is suffered. Snyder v. I. Jay Realty Co., 30 N.J. 303, 312 (1959); Williams v. Morristown Memorial Hospital, supra, 59 N.J. Super., at p. 389. Finally, the invitee is he "who is invited or permitted to enter or remain on land for a purpose of the occupier." Prosser, supra, § 78, p. 452; 2 Harper & James, supra, § 27.1, p. 1431. He enters "by invitation, express or implied." Snyder v. I. Jay Realty Co., supra, 30 N.J., at p. 312; Lordi v. Spiotta, supra, 133 N.J.L., at p. 584.
Aside from the proffered testimony of Anderson, the investigator, plaintiff's case was devoid of any evidence or inference of an express or implied invitation from defendants to Handleman or to any Senak salesman to enter the rear room of the diner. Evaluating the evidence in the posture in which it stood at the conclusion of plaintiff's case, Handleman did not qualify as an invitee at the moment of his fall.
We are not called upon to determine plaintiff's precise status when he first entered the diner and spoke to Lawson. Probably, as the trial judge suggested, he was at that moment by implication an invitee. At the least, he was at that time defendants' licensee. Since Cox and Tillotsen knew that their employees had dealings with Senak personnel in purchasing merchandise and did not direct them to discontinue this association, it is clear that plaintiff's presence in the front of the diner was tolerated. One who enters the business premises of another to negotiate a private sale with someone other than the owner, even without the owner's knowledge and without his express or implied invitation, has been characterized as a licensee. Willins v. *327 Ludwig, 136 N.J.L. 208, 211 (E. & A. 1947); Annotation, 78 A.L.R.2d § 4, p. 119.
The jury could have inferred that Lawson directed plaintiff to bring the silverware into the kitchen through the rear door. The dining area was fully occupied at the time, and it was to be expected that defendants' employees would conduct their personal purchases at the rear platform or in the kitchen, where it was less crowded. Other factors that lead us to conclude that a jury question was presented as to plaintiff's status as a licensee or gratuitous licensee are that: there was an absence of any sign at the rear door prohibiting admittance by anyone; Cox and Tillotsen knew of their employees' practice of buying from salesmen who visited the diner; all deliveries of merchandise for the diner were made through the rear entrance. These factors indicate that it was the ordinary, not extraordinary, practice to receive business visitors in the rear of the diner.
The immediate question thus becomes whether or not a jury could find that Handleman surrendered his status as a gratuitous licensee when he entered the rear door. In Snyder v. I. Jay Realty Co., supra, 30 N.J., at p. 312, the court stated:
"We believe that visiting an employee at his place of employment, where a hazardous activity is not being conducted in the area visited, does not go beyond generally accepted modes of behavior or custom, and in the absence of any prior expression of disapproval by the employer the visitor is not a trespasser but one whose presence is suffered and therefore is lawfully upon the premises."
In this regard the social guest of an employee, while not an invitee, is, nevertheless, a gratuitous licensee. Restatement, Torts, supra, §§ 330, 331; Prosser, supra, § 77, p. 446.
We believe that the jury could have found at the conclusion of plaintiff's case that Handleman's presence in the rear of the diner did not exceed "generally accepted modes of behavior" under all the circumstances here present. The *328 factors of most particular significance were those of the unavailability of space in the front of the diner, the invitation by Lawson, the nature of the transaction between plaintiff and defendants' employees, and the time at which the call was made. There was a question of fact to be determined by a jury as to whether or not Cox and Tillotsen actually did prohibit salesmen engaged in private undertakings with their employees from entering the rear room. So viewed, the jury could have found plaintiff occupied the status of licensee at the time he was injured.
The duty owed by the occupier of premises to a licensee is to abstain from acts willfully injurious. But if "there is a known dangerous condition on the premises which the occupier could reasonably anticipate that his licensee would not observe and avoid, he must either give warning or make the condition reasonably safe." Snyder v. I. Jay Realty Co., supra, 30 N.J., at pp. 316-7; Berger v. Shapiro, 30 N.J. 89, 98 (1959); Williams v. Morristown Memorial Hospital, supra, 59 N.J. Super., at p. 389; Mistretta v. Alessi, 45 N.J. Super. 176, 180 (App. Div. 1957); Prosser, supra, § 77, pp. 448-50; Restatement, Torts, supra, §§ 340-2, pp. 927-31; 2 Harper & James, supra, § 27.9, pp. 1471-5; Annotation, 55 A.L.R.2d 525 (1957). The foregoing principle has been looked upon as an extension of the rule, Mistretta v. Alessi, supra, 45 N.J. Super., at p. 179, Lordi v. Spiotta, supra, 133 N.J.L., at pp. 584-586, that the occupier of land must not set a trap for a licensee. The licensee, on the other hand, is under an obligation to make reasonable use of his faculties to observe any dangerous condition. Berger v. Shapiro, supra, 30 N.J., at pp. 98-9.
Savage acknowledged knowing the carton was on the platform, thus blocking a view of the cellar stairs by anyone entering through the rear door, at the time he saw plaintiff approach that door. However, neither Cox nor Tillotsen was on the premises at the time or had knowledge of this dangerous condition. On the basis of the evidence *329 presented, neither Savage nor Lawson was performing any service for defendants in relation to plaintiff when Handleman was told to enter with the silverware at the rear entrance. This is similar to the facts noted in the Snyder case where the court, after determining that the defendants-lessees owed no duty to plaintiff because he was not on the leased portion of the premises, said:
"Moreover, the partners of the tenant were not actually present and had no personal knowledge of plaintiff's intended visit. The plaintiff was not a customer or a business invitee of theirs and there was no evidence that at the time of the occurrence either Selleck or Batten was performing any service for the tenant in relation to the plaintiff. See Restatement, Agency, § 242; * * *." 30 N.J., at pp. 317-8.
Therefore, even if the jury would have found plaintiff to be a licensee at the time he sustained his injuries, the dangerous condition (the obscuring of the stairs by the carton) was not actually known by defendants or by an employee performing a service for them in relation to plaintiff.
The only other basis upon which defendants could be held liable to plaintiff as a licensee would be if the location of the stairs and the length of the platform could be considered a dangerous condition which defendants could reasonably have expected that plaintiff would not observe and avoid. Although there is considerable doubt that the platform length did not comply with the requirements of the building code (and if it did not, it was only by a few inches), we find the evidence relating to the physical aspect of the platform as providing no real basis for considering the platform the proximate cause of the accident. It was the carton, in part concealing the presence of the steps, which may have proximately been responsible for the accident.
It appears, therefore, that the court was correct in granting defendants' motion. The basis, however, should *330 have been that defendants did not breach any duty owed to plaintiff as a licensee, and not that he was a trespasser.
The second ground urged for reversal concerns the denial of plaintiff's motion to reopen his case to introduce further proof as to his status while in the rear of the diner. That proof would have been Anderson's testimony as to his conversation with Cox.
Analyzing the offer of proof, we find that it points towards a conclusion that Handleman was an implied invitee while in the rear of the diner. The test of an implied invitation is whether "the entry upon the premises was for a purpose directly or indirectly connected with the business carried on there by the occupier, or was of interest or advantage to the occupier, or was in pursuance of an interest or advantage which is common or mutual to the occupier and to him who enters." (Emphasis added.) Barnard v. Trenton-New Brunswick Theatres Co., 32 N.J. Super. 551, 555 (App. Div. 1954); Phillips v. Library Co., 55 N.J.L. 307, 310-11 (E. & A. 1893).
We have focused our attention upon that part of the above quoted test of implied invitation which relates to entry upon the premises having been "of interest or advantage to the occupier"  here the defendants. The jury could have found, had Anderson testified, that Handleman's visit to the rear entrance was in defendants' interest and advantage, and therefore there was an implied invitation. Handleman went there at Lawson's direction, only for sufficient time to exhibit and sell the silverware, and thus avoided interference with the lunchtime rush of business at the diner counter. His going to the rear entrance helped, in a measure, to relieve congestion in the small diner. By bringing merchandise to defendants' employees, he provided a convenience which relieved them of having to shop elsewhere for the goods on their own time. The visits of these Senak salesmen increased the possibility that they would become customers of the diner. Moreover, there was the further possibility that defendants might have chosen *331 to purchase goods from Senak for use in the diner as a result of the sales to Cox and defendants' employees. All these factors indicate there was a benefit to defendants' business by having Senak salesmen exhibit and sell their goods at the rear of the premises. Furthermore, if Anderson had been allowed to testify, the jury could have found that Cox had himself purchased merchandise from Senak's salesmen, knew that his employees made similar purchases, and "if the place was busy, they would be asked to come around to the back entrance," although "not a public entrance * * * but exceptions were made for these salesmen."
Having established that a jury question was raised as to whether plaintiff was an implied invitee on the basis of the offer of proof, it is quite clear that a further jury question was presented as to whether defendants had breached a duty owed to Handleman as an invitee. The duty owed in these circumstances is to exercise reasonable care for the invitee's safety, to see that he is not injured by any negligent activity, and to warn not only of dangerous conditions actually known to defendants or either of them, but also of dangerous conditions or possible defects which they, by the exercise of reasonable care, could discover. Gudnestad v. Seaboard Coal Dock Co., 15 N.J. 210, 219 (1954); Barnard v. Trenton-New Brunswick Theatres Co., supra, 32 N.J. Super., at p. 557; Restatement, Torts, § 343; 2 Harper & James, supra, § 27.12, p. 1487; Prosser, supra, § 78, p. 459.
The performance of this duty is also chargeable to defendants' employees. Terranella v. Union Building and Construction Co., 3 N.J. 443, 448 (1950); Barnard v. Trenton-New Brunswick Theatres Co., supra, 32 N.J. Super., at p. 557. Since Savage admitted seeing the carton within a period of time before the fall which the jury might have considered adequate for its removal, and since the jury might also have found that allowing the carton to remain on the platform did not comport with the exercise *332 of reasonable care for the safety of an implied invitee, the circle becomes complete and jury questions were presented on all the vital elements on the issue of negligence to an implied invitee. We again note that it was the presence of the carton on the platform, not the construction of the platform, which the jury could have considered as evidence of negligence in creating a condition of potential danger to one in plaintiff's position. Therefore, had the offer of proof been accepted, the motion to dismiss would have had to be denied.
The final step, then, is to evaluate the propriety of the trial judge's action. Defendants' motion for dismissal, as might be expected, dealt with various aspects of plaintiff's proofs and the application of appropriate authorities, particularly Snyder v. I. Jay Realty Co., supra. As we read the colloquy, we perceive its main thrust to have been whether plaintiff was a licensee or an invitee. To the obvious surprise of plaintiff's attorney, the trial judge, at the very close of the colloquy, took the view that plaintiff occupied no higher status than that of a trespasser. Although counsel represented to us that the argument on defendants' motion to dismiss consumed some two hours, examination of the typewritten appendix revealed that approximately half the time was devoted to the admission into evidence of exhibits, depositions, and certain replies to demands for admissions. In any event, as already noted, it is our opinion that the reopening was a matter which could easily have been accomplished under the circumstances. The jury had not been discharged. The Anderson report had been marked for identification and Mr. Anderson was in court prepared to testify.
It is true that hindsight indicated to plaintiff's attorney that it would have been wiser had he elicited the proofs belatedly offered, when he had Anderson on the stand during the presentation of plaintiff's case. But his trial tactic is understandable. He thought it better to have Anderson testify in rebuttal, should Cox take the stand and *333 deny there was any sort of invitation held out to Senak salesmen to use the rear entrance. An appellate court is ordinarily reluctant to interfere with a trial judge's exercise of discretion, but a case may be reopened to receive omitted evidence because of a mistake as to the necessity for offering particular evidence in order to prevent a nonsuit. Gerson v. Metropolitan Life Ins. Co., 117 N.J.L. 190, 192 (E. & A. 1936). However, we are convinced that judicial discretion was not properly exercised in the circumstances of this case, and that substantial justice demands that there be a new trial. Magich v. John Hancock Mutual Ins. Co., 32 N.J. Super. 33, 39 (App. Div. 1954); Gibilterra v. Rosemawr Homes, 32 N.J. Super. 315, 322 (App. Div. 1954), affirmed 19 N.J. 166 (1955). The issue in dispute seriously affected the substantial rights of the plaintiff and he should have been given the opportunity to supplement his proofs. Carlo v. Okonite-Callender Cable Co., 2 N.J. Super. 122, 125 (App. Div.), affirmed 3 N.J. 253 (1949); Gerson v. Metropolitan Life Ins. Co., supra; Juliano v. Abeles, 12 N.J. Misc. 667, 669, 174 A. 341 (Sup. Ct. 1934). As in Magich, we hold, under R.R. 1:5-3(b) and 1:27A, that denial of plaintiff's request was an abuse of discretion and reversible error.
We are aware that plaintiff is now seeking the protection of a liberal interpretation of the rules of procedure when, at the trial, believing that his proof was sufficient to establish a prima facie case for jury consideration, he withheld his crucial item of evidence until an opportune time presented itself during Cox's cross-examination. We do not approve of the piecemeal presentation of testimony where the elements of the cause of action are so closely contested. However, since the advantage of surprise has been lost and it is probable that Anderson's testimony will entitle plaintiff to have the jury pass on the merits of his claim, we therefore reverse the denial of plaintiff's motion to reopen.
While Blum v. Parsons Manufacturing Co., 95 N.J.L. 471 (E. & A. 1921) and Smith v. Smith, 17 N.J. Super. *334 128 (App. Div. 1951), certif. denied 9 N.J. 178 (1952), might appear to support a contrary conclusion, we find both decisions clearly distinguishable.
In Blum defense counsel did not make his motion to reopen until he had partly summed up his case to the jury. Actually he was only seeking to introduce the record of a judgment in a previous action between the parties. That judgment had no application to the controversy being tried. The motion was denied and the jury was permitted to deliberate and return a verdict. By way of dictum, the Court of Errors and Appeals added that "if it [the record of the judgment] was material it was not an abuse of discretion to refuse to open the case and admit evidence omitted which was within the knowledge of the party before the close of the case." 95 N.J.L., at p. 473. Clearly, the disposition of the motion to reopen in Blum was not especially vital to the merits of the case. Nor was the denial of the motion determinative, as here, of the all important issue of whether plaintiff was to have a jury decide if he was entitled to a judgment.
Admittedly, the facts of Smith bear a closer relation to the cause under review. There it was held that the denial of plaintiff's motion to introduce additional evidence after the action had been dismissed was clearly within the bounds of sound discretion. In that action, however, after plaintiff had voluntarily rested his case the judge announced, "I am frank to admit that I have got to be shown what I don't see now, the evidence upon which I am justified in putting the defense on their proof." 17 N.J. Super., at p. 134.
The judge then postponed the case for two weeks to allow counsel for plaintiff to submit a brief in support of a finding that the defendants should present their defense. In granting this postponement, the judge specifically stated that he could not fathom why plaintiff and other key witnesses had not been called upon to testify. They had been in the court room throughout the trial but were not *335 called upon "to give any testimony regarding these transactions about which certainly they know more than anybody else." Id., at p. 135.
After the brief was filed the judge dismissed the action. Plaintiff's counsel then moved to reopen the case, stating that "through mistake and inadvertence I omitted to call to the witness stand before resting plaintiff's case, * * * the plaintiff and other witnesses." The motion was denied.
The Smith decision may be distinguished on the following grounds. Counsel for plaintiff in that action was unmistakably alerted to the fact that he stood in danger of having his action dismissed. Handleman's counsel, however, was not alerted until late in the argument of the motion for dismissal that his client's status, in the eyes of the trial judge, was that of a trespasser. He did not have the opportunity to consider and reflect, as did counsel in Smith, nor was he unequivocally forewarned by the judge of the probability of a dismissal. We cannot find a real parallel between the unusual circumstances of Smith and the present appeal. Cf., however, Pirozzi v. Acme Holding Co., 5 N.J. 178, 184-5 (1950).
Reversed and remanded for a new trial.
FOLEY, J.A.D. (dissenting).
I am unable to agree that the trial court exceeded its discretion in refusing to permit plaintiff to reopen his case, and to take the testimony of the witness Anderson, after the court had directed the entry of a judgment of involuntary dismissal.

I.
We were informed on the oral argument of the appeal that the argument on the motion consumed some two hours. It is apparent that throughout that argument, and indeed as the trial judge noted, throughout the trial, the pre-eminent issue in the case was the legal status of plaintiff as an invitee on defendants' premises. Moreover, the pretrial *336 order clearly reflects this basic dispute. Plaintiff's attorney was fully aware of this situation and although Anderson had been on the witness stand, he chose to withhold the testimony concerning Anderson's investigational interview of the defendant Cox, for what he did not deny under pointed questioning by the trial judge, and does not deny now, were tactical reasons.
Here, was not a case of oversight or inadvertence by an inexperienced attorney and nobody claims that it was. On the contrary, an exercise of judgment was made by a capable and experienced trial attorney, necessarily, with the calculated risk that if Cox did not testify, the foundation could not be laid for affecting his credibility through Anderson's testimony on rebuttal. Furthermore, the attorney held to the course he had charted to the very end, notwithstanding the fact that had he asked leave to reopen at any time prior to the court's pronouncement of judgment, it would, in all likelihood, have been granted.
While it may be argued that plaintiff was not personally accountable for the plan of action undertaken by his attorney, I think that this offers no reason to hold that he was denied substantial justice by the trial court's refusal to reopen the case. The attorney-client relationship binds the client to the conduct of his case by his attorney, at least where, as here, the attorney's judgment of how available evidence may best be used is involved. It should be remembered that just as advantages redound to the client's benefit if his attorney's strategy achieves success, so should he be required to accept the consequences if it misfires. As was said in Mitchell v. United States, 104 U.S. App. D.C. 57, 259 F.2d 787, at pp. 791-792 (1958), cert. denied 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958):
"* * * [A]lmost any judge or lawyer can point to potential mistakes in reviewing the record of a lost cause; and that even trial counsel, having lost, can almost invariably enumerate what in the hindsight of disaster appear to have been errors. * * * Bad judgment, or even good but erroneous judgment, may result in *337 adverse effects. These are simple facts of trial; they are not justiciable issues."
Furthermore, neither the court nor other litigants therein should be required to accommodate themselves to time consuming experiments in advocacy pursued with deliberate but abortive effect.
Thus, I am strongly of the view that the obligation of a court to do substantial justice should not ordinarily embrace a form of judicial paternalism requiring it to undo every act of an advocate which by "20/20 hindsight" proves to have been inadvisable. Compare Smith v. Smith, 17 N.J. Super. 128 (App. Div. 1951), certif. denied 9 N.J. 178 (1952). See also Blum v. Parsons Manufacturing Co., 95 N.J.L. 471 (E. & A. 1921).
Traditionally appellate courts have accorded great respect to the exercise of discretion by the trial judge, recognizing as they do his opportunity to survey at first hand the evidential and procedural complex in which he is called upon to act, and the competing considerations which may affect his judgment of what course will best serve justice. Among these is the strong judicial policy of granting finality to litigation where the parties thereto have had ample opportunity to be heard before judgment is passed, as is exemplified by R.R. 4:62-2(b) (newly discovered evidence). Every experienced trial judge is aware of the weighty responsibility imposed upon him in the exercise of this discretion, and his resolution of the problem confronting him should not be disturbed except for reasons which compel the conclusion that the judge misunderstood or misapplied the law, or was so patently injudicious in his ruling as to have subverted a fair trial. When in an appellate court the exercise of discretion by a nisi prius judge is placed in question, the inquiry should not be, would we have acted differently? It should be no more than, does the action taken by the trial judge reflect an understanding of the problem presented and was there valid reason for his *338 deciding as he did? If so "substantial justice," in its most accurate sense, was rendered to both parties.
Citation of authority on a problem of this kind is of little value when it is directed to a comparison of the divergent factual situations appearing in the individual cases discussed. When, and when not, a trial judge will be deemed to have abused his discretion may not be so patly appraised. The determination rests upon a much broader inquiry. In Smith v. Smith, supra, 17 N.J. Super., at pp. 132-133, Judge Jayne defined the appellate approach to the problem thus:
"From an acquaintance with the more impressive judicial utterances on the subject of abuse of discretion, it will be deduced that there are two conditions which must exist to warrant an appellate court in nullifying a ruling of the trial court made in the exercise of a conceded discretion. The first is that the judicial action must have been clearly unreasonable in the light of the accompanying and surrounding circumstances, and the second condition is that the ruling must have resulted prejudicially to the rights of the party complaining.
With relation to the first condition it is not to be supposed that a mere difference in judicial opinion concerning the feasibility, expediency or pragmatical propriety of the ruling is synonymous with abuse of judicial discretion. * * *
Anent the second condition, Justice Southard in the early case of Ogden v. Gibbons, 5 N.J.L. 612 ([*]518) (Sup. Ct. 1819), remarked (at p. 626 ([*]531)): `But the inquiry always is, Has injustice been done? Has the party been injured? If he have not, no good reason can be given why he should receive the favor of trying his cause over again.' In accord, Wait v. Krewson, 59 N.J.L. 71 (Sup. Ct. 1896). Essentially it is the manifest denial of justice to a party that constitutes an abuse of discretion." (Emphasis added)
What seems to me to be overlooked by the majority is that there must be a concurrence of the two-fold criteria specified by Judge Jayne before it may be said that the refusal of the trial court to reopen represented a "manifest denial of justice."
Assuming that such refusal did prejudice the plaintiff in the sense that he was prevented from having the jury pass on his claim (a premise with which I do not agree, as *339 shortly will be pointed out), how may it be said that the judicial action was "clearly unreasonable in the light of the accompanying and surrounding circumstances"?
The treatment by the majority of this question which goes to the heart of the exercise by the able and experienced trial judge of his discretion, shocks me.
As revealed by the colloquy, the "accompanying and surrounding circumstances" anent the plaintiff's motion to reopen, do not warrant the indulgence of the attorney's trial tactics accorded him by the majority. To say as the majority does that "hindsight indicated to plaintiff's attorney that it would have been wiser had he elicited the proofs belatedly offered"; to find his not having done so was "understandable" because "he thought it better to have Anderson testify in rebuttal"; and to add only a mildly registered disapproval of this "piecemeal presentation of testimony," place the exercise by a trial judge of his discretion in a glaringly false light.
The plain fact is, as we have indicated above, the colloquy impels the conclusion that plaintiff's attorney in the hope that his complaint would not be dismissed deliberately withheld what he conceived to be a crucial item of evidence for cross-examination, expecting to gain a dramatic advantage thereby, and having run the attendant risk and failed, he now complains of being penalized for what occurred actually by his own doing.
It was in this factual setting that the trial judge acted as his conscience dictated, and to now transfer to him a responsibility which at all times rested squarely on the shoulders of the attorney is in my judgment most unjust. It seems to me that in the analysis on review of what prompted a judge to act as he did in a discretionary matter, the judge is also entitled to "substantial justice."

II.
I agree with the majority that the posture of plaintiff's proofs at the close of his case permitted of an inference *340 that his status was that of a gratuitous licensee. I agree also, for the reasons expressed by the majority that the allegedly dangerous condition which may have caused plaintiff to fall was not one for which defendants were answerable to a gratuitous licensee.
I cannot agree, however, with the reasoning of my brothers that had Anderson been allowed to testify in accordance with his report, a permissible inference that Handleman's status was that of an implied invitee would have arisen. They acknowledge that such status could not be achieved by plaintiff unless his entry upon the premises was for a purpose directly or indirectly connected with the business carried on there by defendants, or was of interest and advantage to the defendants, or was in pursuance of an interest which was common or mutual to the parties, and then go on to say that upon the basis of Anderson's testimony a legitimate inference could be drawn which would invoke application of the alternative italicized.
Thus, although the majority expressly holds that "on the basis of the evidence presented, neither Savage nor Lawson was performing any service for the defendants in relation to the plaintiff when Handleman was told to enter," it nevertheless concludes that had plaintiff been allowed to prove that salesmen had on prior occasions been permitted to come to the rear door "if the place was busy," it would have been permissible for the jury to infer that the defendants on this particular occasion derived a business benefit from Handleman's presence in the rear of the building.
I find this to be a non sequitur. I am unable to see how the essential character of the transaction between Lawson and Handleman  one purely personal to both, and with the defendants not even being present  could be changed simply because similar transactions had been permitted before. It strikes me that the proffered proof would have done no more than to reinforce Handleman's status, and that of the salesman who had previously gone to the rear door, as gratuitous licensees. The majority seems to *341 express the view that although the private character of the transaction was not altered by prior transactions, an implied invitation could be erected upon a premise that the defendants directly or indirectly benefited thereby. I cannot disagree with this thesis when it is stated abstractly. However, where it has been made the basis for a finding of invitation the "benefit" to the defendant, present or future, has been reasonably foreseeable, not merely conjectural or theoretical. See Barnard v. Trenton-New Brunswick Theatres Co., 32 N.J. Super. 551 (App. Div. 1954), and cases collected therein.
I am, therefore, in disagreement with the majority as it applies this principle to the facts at hand. They speak of the advantage defendants gained by "avoiding interference with the lunch-time rush of business," and say that Handleman's use of the rear entrance "in a measure helped to relieve congestion in the small diner." The sole basis for these observations is that Handleman testified that on the day in question "the place was full * * * all the stools were taken." Accepting this evidence at face value as we must, and drawing from it all inferences which would support plaintiff's cause, it is not clear to me how taking Lawson from his station at the hamburger stand to the rear of the "congested" diner, and leaving the "lunchtime rush of business" in the sole care of Savage who was making coffee, enhanced the efficiency of defendants' business operation or otherwise advantaged them.
The majority speaks also of the potential benefits derived by defendants through providing the employees with a "convenience" which relieved them of the effort of shopping elsewhere for goods on their own time. There is not the slightest evidence that either the defendants or their employees ever sought to engraft this "fringe benefit" upon the working conditions, or that it was accepted as such by the employees and thus that it might have redounded to the employer's advantage in specie of labor relations.
*342 Attention is likewise called by the majority to potential benefits inhering in the possibility that Senak salesmen might become customers of the diner, or that defendants might become customers of Senak. While these supposed advantages might properly spell out an invitation to salesmen, plaintiff included, to enter the part of the premises in which the defendants conducted their business with the public, when considered as supporting his status as an invitee in parts of the premises ordinarily reserved exclusively for the use of defendants and their employees, and keyed to plaintiff's expressed purpose in going to the rear of the establishment to do business with Lawson personally, they take on a quality of evanescence which I find to be more compatible with sheer speculation than with logical inference.
I am convinced, therefore, that had Anderson been permitted to testify in accordance with his report, no legitimate inference of implied invitation would have been established, and consequently, that if the trial court was in error in denying the motion to reopen for this purpose, the error was not prejudicial. See R.R. 1:5-3(b).
Accordingly, I would affirm.