76 N.J. Super. 11 (1962)
183 A.2d 712
JOAN QUINLAN AND JOSEPH QUINLAN, HER HUSBAND, PLAINTIFFS-RESPONDENTS,
v.
JOSEPH QUINLAN AND ELIZABETH QUINLAN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 18, 1961.
Decided July 27, 1962.
*12 Before Judges GAULKIN, KILKENNY and HERBERT.
Mr. H. Curtis Meanor argued the cause for appellants (Messrs. Lamb, Langan & Blake, attorneys).
Mr. Frederic K. Becker argued the cause for respondents (Messrs. Wilentz, Goldman, Spitzer & Sills, attorneys).
The opinion of the court was delivered by HERBERT, J.S.C. (temporarily assigned).
During the evening of February 26, 1958, at about 10:30, the plaintiff Joan Quinlan had a fall in the driveway located on the *13 defendants' premises in South Amboy. Her arm was badly broken, and after several unsuccessful attempts to set the fracture and secure a union a bone grafting operation was finally performed.
Eight months after her fall Joan Quinlan brought suit, charging the defendants with responsibility for damages because of "the negligent maintenance" of their property. Her husband joined as a plaintiff to claim for the loss of his wife's services and consortium as well as for his expenses.
Joan Quinlan is the daughter-in-law of the defendants and the plaintiff Joseph Quinlan is, of course, their son.
At the close of trial in the Law Division the jury found against both defendants in favor of Joan for $12,000 and in favor of her husband for $2,745. The defendants have appealed to us from the judgment entered against them on the jury's verdict. They urge a number of reasons for reversal but we find it necessary to consider only the refusal of the trial judge to grant the motion for judgment which was made at the close of the plaintiffs' evidence. That motion was grounded upon Joan Quinlan's status as a licensee and the defendants' ignorance of the existence of a patch of solid ice in their driveway, a patch which Joan testified was the cause of her fall. The motion should have been granted.
Before the accident the plaintiffs had been to Newark to shop. They had been part of a group making the trip in a car owned and driven by Mr. Kurtz. In the group was Mrs. Bloodgood, who lived with the defendants and was the sister of one of them. Mr. Kurtz was her son-in-law. The starting point had been the defendants' home. The plaintiffs, early in the evening, had driven there and had left their car parked in the street in front of the house. They then walked along the defendants' driveway and entered the house by the side door. At that time the weather was dry and the drive was entirely clear of ice and snow. Later in the evening, as the party was driving back from Newark to South Amboy, there was a storm. Rain, sleet and hail *14 fell. Joan Quinlan described the storm as "a mixture of everything."
Upon getting back to the defendants' home, Mr. Kurtz ran his car into the driveway and stopped near the side door so that Mrs. Bloodgood might use that entrance. Joan Quinlan and her husband got out of the car at the same time. They had no intention of visiting the defendants and were going to walk along the driveway to the street and their own parked car. Having discharged his passengers, Mr. Kurtz backed out to the street and drove away. Joan Quinlan then walked along the driveway beside the house in the direction of the street. Her husband stayed behind momentarily to help Mrs. Bloodgood with her packages. It was at this time that Joan Quinlan fell.
Inside the house the defendant Elizabeth Quinlan had gone to bed. There is no evidence at all that she knew the weather was bad outside. The defendant Joseph Quinlan was in the kitchen having a cup of tea. Shortly before, at about 10:15, he had returned from the store which he operated. Rain and sleet were falling as he drove himself home. When his car went along his driveway to the garage he heard ice cracking beneath the wheels but there was no slipping. That the plaintiffs had been to the house earlier in the evening was unknown to him. He did not expect them to visit his property upon their return from Newark, for he knew nothing of their trip.
The plaintiffs, on this appeal and as they did at the trial, point to a leader or downspout near the front corner of the defendants' house so constructed as to carry water from the roof and discharge it in the open just above the surface of the driveway. Upon being discharged from the spout's bottom opening, water obviously would flow over the surface of the pavement with the prevailing grades. The spout or leader had existed in the described position for about 2 1/2 years before the accident. The defendant Joseph Quinlan, called by the plaintiffs, testified to that effect. Another witness for the plaintiffs was a licensed engineer who said *15 he inspected the leaders at the defendants' home some time after the accident. He expressed the opinion that they do not represent good construction; that good construction would require their being connected with a sewer or an underground pipe leading to the curb, or that they discharge into a dry well. He stated the obvious conclusion that water flowing from the spouts upon the surface beneath would form into ice at freezing temperatures.
The spout near the front corner of the house is important because Joan Quinlan testified that she walked safely in darkness or poor light some 30 feet toward the street over "crunchy" ice; then, when about three feet beyond the spout's outlet, she reached a slippery section of ice and went down. Her husband corroborated her testimony about a patch of solid ice at the point where she fell. He described it as a "cake of ice underneath the drain." Mr. Kurtz gave similar testimony about the presence of a patch of ice, he having returned to the scene later the same night after reporting for work as a member of the police force. Both the husband and Kurtz said they had seen ice on the drive beneath the spout at other times.
There was no testimony at all that the defendant Joseph Quinlan had any knowledge before or at the time of the accident of the existence of the area of solid ice on which his daughter-in-law testified she fell. Though, as already noted, he was a witness for the plaintiffs, no questions directly on this subject were addressed to him. Nor was there any testimony as to whether he had ever seen at any other time ice on his drive below the outlet of the spout. He had, however, driven home through the bad weather only a few minutes before the accident; and he was the witness who established that the placement of the leaders on his house had remained unchanged for over two years. As to the defendant Elizabeth Quinlan, the only reasonable inference from her having gone to bed early is that she knew nothing of the storm and hence knew nothing about a patch of ice. What she may have known concerning the *16 construction of the spout, or realized about its functioning, we cannot say. And as to the status of Joan Quinlan on the defendants' premises, that was established by a stipulation in the pretrial order specifying she was a licensee.
The plaintiffs, on these facts, contend basically that what called for submission of the case to the jury was the placement, or method of construction, of the leader under which the patch of ice formed. This theory is in conflict with the law of New Jersey as declared in Berger v. Shapiro, 30 N.J. 89, at pp. 98 and 99 (1959). There Justice Proctor said for the court.
"The host is not required to inspect the premises to discover defects or to maintain them in a safe condition for his guest, but if he knows of any defective or dangerous condition he must exercise reasonable care to correct the condition or warn the guest of the danger. Vogel v. Eckert, supra; Annotation, `Duty of a possessor of land to warn adult licensee of danger,' 55 A.L.R.2d 525 (1957); 2 Harper and James, supra, 1471; see Mistretta v. Alessi, 45 N.J. Super. 176 (App. Div. 1957); Debes v. Morganroth, 48 N.J. Super. 39 (App. Div. 1957).

* * * * * * * *
The exception relating to a dangerous condition on the premises which is known to the host and which he has reason to believe his guest cannot be expected to observe and avoid has been encompassed in the Restatement, supra, § 342. We believe that in the home host-guest relationship this section represents the law of this State:
`A possessor of land is subject to liability for bodily harm caused to gratuitous licensees by a natural or artificial condition thereon if, but only if, he
(a) knows of the condition and realizes that it involves an unreasonable risk to them and has reason to believe that they will not discover the condition or realize the risk, and
(b) invites or permits them to enter or remain upon the land, without exercising reasonable care
(i) to make the condition reasonably safe, or
(ii) to warn them of the condition and the risk involved therein.'"
The Restatement quoted is, of course, the Restatement of Torts (1934).
The defendant Joseph Quinlan knew how his leaders were placed. They were not a hazard to anyone, however. *17 The hazard was the patch of solid ice under the front leader; and he knew nothing of that and was therefore not responsible for making it safe to walk upon, or for warning his daughter-in-law that it might be more slippery than the rest of the ice-covered driveway. This conclusion is supported particularly by one of the comments under section 342 of the Restatement, Torts, and two of the illustrations which follow it:
"c. Inspection. A possessor of land owes to a gratuitous licensee no duty to prepare a safe place for the licensee's reception or to inspect the land to discover possible or even probable dangers.
If the license is gratuitous, the privilege to enter is a gift and the licensee, as the recipient thereof, is entitled to expect nothing more than a disclosure of the conditions which he will meet if he acts upon the license and enters, in so far as those conditions are known to the giver of the privilege.
A member of the possessor's family or his social guest is also entitled at most to knowledge of such dangerous conditions as the possessor knows.
Illustrations:

* * * * * * * *
2. A invites his friend, B, to dinner. A knows that his private road has been dangerously undermined at a point where it runs along an embankment and that this is not observable to a person driving along the road. A, when giving the invitation, forgets to warn B of this. While B is driving along the road, it collapses causing serious harm to B. A is liable to B.
3. Under facts similar to those in Illustration 2, except that A does not know that the road has been undermined but could have discovered it had he paid attention to the condition of his road, A is not liable to B." (Emphasis added)
Other cases have presented essentially the same problem of a landowner's knowledge as that raised in the present case. Handleman v. Cox, 74 N.J. Super. 316, 328 et seq. (App. Div. 1962); and Vogel v. Eckert, 22 N.J. Super. 220 (App. Div. 1952), cited with approval by the Supreme Court in the quotation we have taken from Berger v. Shapiro, supra. For the owner to be aware of the particular condition  here the patch of solid ice  is what counts. The Vogel case will *18 serve as an example. There the plaintiff, a social guest and hence a licensee, was hurt when a wooden bench, used out of doors, collapsed. After the collapse an examination of the broken bench, which was 10 or 12 years old, disclosed that nails had pulled loose from rotted wood and caused the break. At the trial an expert witness testified that accepted standards for outdoor furniture required wood to be painted or treated with a preservative. Mr. Eckert had built the bench himself and, of course, knew that it was not painted and had not been treated with any preservative. Nevertheless the court held he had no knowledge of the condition  rotting around the nails  which had proved to be hazardous, and that the trial judge therefore had entered properly a judgment of dismissal at the conclusion of the plaintiffs' case.
It may be inferred that the defendant husband in Vogel v. Eckert, supra, as a man of reasonable experience must have realized that rotting of his unpainted and unpreserved wooden bench was inevitable sooner or later. Yet that was not enough to get the claim of Mrs. Vogel to the jury. Here, if it be inferred that the senior Quinlans must have realized that water flowing from the leaders of their house would freeze on the ground at some time or another as result of just the right weather conditions, is there any basis at all for extending that general knowledge of Nature's ways to encompass certain happenings and a result on the night of February 26, 1958 of which they had no actual knowledge, namely: the flowing of water from the front leader, freezing of that water on the driveway under the leader and the fact that such freezing produced a patch of ice more slippery than the ice on the balance of the drive? This question must be answered in the negative, even though the defendant Joseph Quinlan had come home only a few minutes before the accident and knew the weather was bad. With no duty to inspect for "possible or even probable dangers" (Restatement, Torts, supra), the senior Quinlans *19 should not have been exposed to what at best must have been the speculation of the jury as to defendants' responsibility for a condition which, although possible, was obviously the result of an unsual set of circumstances, a condition of which the defendants were actually ignorant.
If our law imposed upon a landowner an obligation to a licensee based only upon a general test of foreseeability of harm  which it does not  as to the application of such test we could say the record raises doubts that weather conditions at the defendants' home on the night of February 26 were such as to lead sensible men to consider that there might be any special hazard along the driveway. Mr. Quinlan, Sr., came home shortly before his son and daughter-in-law reached his house and found the driveway icy but not slippery as he drove into his garage. Both Mr. Kurtz and the plaintiff Joseph Quinlan, Jr., testified that they had seen ice beneath the outlet of the spout on other occasions. Yet Quinlan, Jr., knew that his wife was walking down the driveway in the darkness, or poor light, and gave her no warning of possible danger near the spout. Mr. Kurtz also gave no warning, although he had good reason to know when the plaintiffs alighted from his car, that they were going to walk down the driveway to the street; and he had just driven over or past the spot of ice as he took his car up to the side door of the house. In short, Kurtz and Quinlan, Jr., though claiming knowledge of freezing on other occasions, on this occasion acted as though there was nothing to be concerned about. Going a step further with the same concept of foreseeability, Elizabeth Quinlan had gone to bed before the storm, and her husband knew nothing about the trip to Newark or that his son and daughter-in-law would be likely to come to his house after ten o'clock that night and walk along his driveway. Would it not have been reasonable for him to think that if the sleet and hail he had seen as he came home should produce an icy footing for the morning, he could then do something *20 about it if necessary, and be in plenty of time to anticipate the arrival of any visitors?
After the defendants' motion for judgment had been denied at the close of the plaintiffs' case the small amount of testimony offered on behalf of the defendants made no change in the factual situation which we have described. The motion was then renewed and again denied. This was also error.
The judgment under review is reversed with the direction that judgment be entered in favor of the defendants. The grounds on which we have reached this result make it unnecessary to consider the several other points relied on by the defendants for reversal.